

129 F.3d 114                                                                                         Page 1

129 F.3d 114, 1997 WL 701359 (C.A.2 (N.Y.))
(Cite as: 129 F.3d 114)

Briefs and Other Related Documents
NOTICE: THIS IS AN UNPUBLISHED OPINION.(The Court's decision is referenced in a " Table of Decisions Without Reported Opinions" appearing in the Federal Reporter. Use FI CTA2 s 0.23 for rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Second Circuit.
Sheila M. MARTIN, Plaintiff-Appellant,
v.
CHEMICAL BANK, Kenneth J. Kelly, Barbara E. Daniele, and Ingrid V. Moses,
Defendants-Appellees.
No. 95-9015, 96-9365.

Nov. 10, 1997.

Appearing for Plaintiff-Appellant: Shiela M. Martin,, pro se, East Quogue, N.Y.
Appearing for Defendants-Appellees: Howard Ganz, New York, N.Y.

PRESENT: HON. JON O. NEWMAN, HON. GUIDO CALABRESI, HON. RICHARD D. CUDAHY, FN* Circuit Judges,

> FN* The Honorable Richard D. Cudahy, Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.

*1 UPON CONSIDERATION of this appeal from a judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge* ), it is hereby

ORDERED, ADJUDGED, AND DECREED that the judgment be and it hereby is AFFIRMED

*I. Facts and Procedural History*

Sheila M. Martin appeals from the judgment of the United States District Court for the Southern District of New York (Lewis A. Kaplan, *Judge* ), entered in favor of the defendants in this age discrimination suit after a jury trial. She also moves to reopen and consolidate her previously dismissed appeal from the denial of her motion for relief from judgment pursuant to Federal Rule of Civil Procedure 60(b).

In June 1988, Martin began this *pro se* action against her former employer, Chemical Bank, and the employees who supervised her, alleging age discrimination and retaliatory discharge in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.,* and pendent state law claims for intentional infliction of emotional distress and defamation. According to the complaint, Martin was hired in April 1987, at the age of 53, as a secretary to Kenneth Kelly, the head of Chemical's legal department. She claimed that she looked fifteen to twenty years younger than she actually was, and that her age was not discussed at the time of her hiring. Sometime later, according to Martin, Kelly became aware of Martin's true age and told her that she was "too old for the job." Martin claimed that once her age became known, Kelly and Ingrid Moses, the secretarial supervisor, began harassing her and fabricating complaints about deficiencies in her job performance. As the result of these complaints, Martin was demoted from her position as Kelly's personal secretary to the job of a "floater" in the secretarial pool. After her demotion, Martin was given several additional warnings about her unsatisfactory work by Moses and by Barbara Daniele (who replaced Kelly when he left the company). Martin was ultimately fired in April 1988.

The defendants claimed that Martin was fired solely because of her poor job performance. Kelly denied having told Martin that she was "too old for the job, " and stated that he had removed Martin as his secretary because of a steady decline in the quality

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 114                                                                                                                    Page 2

129 F.3d 114, 1997 WL 701359 (C.A.2 (N.Y.))
(Cite as: 129 F.3d 114)

of her work. Daniele indicated that Martin was slow, was exceptionally deficient with the word processor, and did not take criticism well.

After she was fired, Martin filed complaints with both the Equal Employment Opportunity Commission and the New York City Commission on Human Rights. The EEOC issued a "right to sue" letter to Martin in December 1988, and Martin commenced this action against Chemical Bank and the individual defendants. The district court granted summary judgment to the defendants on the state law claims, but found that Martin had alleged facts sufficient to establish a *prima facie* case of age discrimination, and had proffered some evidence-such as Kelly's alleged remark that Martin was "too old for the job"-to create a genuine issue of material fact as to whether Chemical's dissatisfaction with Martin's performance was pretextual.

*2 Martin retained counsel. Shortly before trial, the district court dismissed the claims against the individual defendants (Kelly, Daniele, and Moses). The case against Chemical Bank was tried before a jury from August 15, 1995 through August 24, 1995. At the conclusion of the trial, the jury returned a verdict in favor of Chemical Bank. The court entered judgment on August 28, 1995.

Martin, acting *pro se*, filed a notice of appeal on September 27, 1995 (No. 95-9015). The appeal was dismissed because of Martin's failure to pay a docketing fee or file a motion to proceed *in forma pauperis*, but was reinstated in January 1996 on Martin's motion to reopen the appeal. In June 1996, almost a year after the entry of final judgment and six months after the appeal from the final judgment was reinstated, Martin filed a *pro se* motion in the district court for relief from the judgment under Federal Rule of Civil Procedure 60(b). Judge Kaplan denied the motion as untimely, holding in the alternative that the motion was meritless. Martin filed a timely notice of appeal from the denial of the Rule 60(b) motion (No. 96-9365). Martin was apparently confused about the need to pay an additional docketing fee for her second appeal, and, as a result, this appeal was dismissed on November 18, 1996 for failure to pay the fee. On May 15, 1997, Martin moved to reinstate her appeal of the denial of her Rule 60(b) motion and consolidate it with her first appeal. On May 20, 1997, that motion was referred to the panel assigned to Martin's original appeal (No. 95-9015).

*II. Discussion*

We grant Martin's motion to reinstate her second appeal (No. 96-9365) and to consolidate it with her first appeal (No. 95-9015), but we affirm the district court's judgment in favor of Chemical Bank and the court's denial of her Rule 60(b) motion since all of Martin's challenges to these are meritless.

A. Martin claims that her "dissatisfaction with her counsel" constitutes grounds for relief from judgment. She was displeased with her trial counsel because allegedly he, *inter alia*, failed to call all of the witnesses and to present all of the evidence Martin wanted him to; misrepresented his level of experience to her; and did not keep her sufficiently informed about the evidence the defendants intended to introduce. But although Martin may have disagreed with the trial strategy employed by her attorney, nothing in the record indicates that her lawyer was incompetent or unethical. In any event, a civil litigant's dissatisfaction with her attorney is not a ground for setting aside a jury verdict. *See, e.g., United States v. Coven*, 662 F.2d 162, 176 (2d Cir.1981).

B. Martin contends that Chemical Bank made improper references to her medical history at trial, allegedly in violation of a pretrial order of a magistrate judge. Martin's counsel did not object at trial to the introduction of this evidence, and issues not raised below cannot serve as the grounds for reversal in the absence of manifest or obvious injustice. *See, e.g., Greene v. United States*, 13 F.3d 577, 586 (2d Cir.1994). The admission of this testimony did not lead to manifest injustice.

*3 C. Martin argues that it was error for the court to allow the trial to go forward when one of Martin's witnesses, an employee of Chemical named Amanda Candidate Strong, ignored a subpoena and did not testify. When Strong failed to appear at

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

129 F.3d 114                                                                                                    Page 3
129 F.3d 114, 1997 WL 701359 (C.A.2 (N.Y.))
(Cite as: 129 F.3d 114)

trial, however, Martin's attorney did not ask for a continuance and did not seek to enforce the subpoena. Instead, he chose to read Strong's deposition testimony into evidence. Given the plaintiff's failure to object, it was not error for the judge to allow the trial to go forward.

Martin asserts that Strong failed to appear because of improper coercion by Chemical Bank. Had Chemical coerced Strong into ignoring the subpoena, that would indeed raise serious questions. But Martin has presented no real evidence to support this claim. Given the lack of proof of this allegation and Martin's failure to raise the issue at trial, relief from judgment is not warranted on this basis.

D. Martin's next claim is that the judgment should be set aside because Chemical Bank proffered false testimony at trial. She argues that several of the defense witnesses lied on the stand. Under Rule 60(b)(3), a judgment may be set aside based on the "fraud ..., misrepresentation, or other misconduct of an adverse party." However, conclusory allegations of perjury are insufficient to support a finding of this sort. Martin has alleged nothing more than the fact that conflicting evidence was presented at trial. In such a situation, the jury is free to makes its own credibility determinations. *See, e.g., Sorlucco v. New York City Police Dep't,* 971 F.2d 864, 875 (2d Cir.1992).

E. Martin contends that the district court erroneously dismissed the suit against the individual defendants. The Second Circuit ruled in *Tomka v. Seiler Corp.,* 66 F.3d 1295, 1317 (2d Cir.1995), that an employer's agent may not be held individually liable under Title VII. The statutory definition of "employer" in the ADEA mirrors the definition in Title VII, *compare* 29 U.S.C. § 630(b) *with* 42 U.S.C. § 2000e(b), and our analysis of claims raised under one of these statutes has generally been informed by cases brought under the other. *See, e.g., Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997) (retaliation claims brought under ADEA approached in the same way as claims under Title VII); *EEOC v. AIC Security Investigations, Ltd.,* 55 F.3d 1276, 1279-80 (7th Cir.1995) (noting that ADA, Title VII, and ADEA statutes are very similar and that "[c]ourts routinely apply arguments regarding individual liability to all three statutes interchangeably."). Accordingly, for substantially the reasons stated in *Tomka,* we hold that individual supervisors may not be held personally liable under the ADEA. *See also Smith v. Lomax,* 45 F.3d 402, 403-04 & n. 4 (11th Cir.1995) (individuals not liable under ADEA); *Birkbeck v. Marvel Lighting Corp.,* 30 F.3d 507, 510 (4th Cir.1994) (same); *Miller v. Maxwell's Int'l Inc.,* 991 F.2d 583, 587-88 (9th Cir.1993) (same).

*III. Conclusion*

*4 We have examined all of Martin's other claims and have found them to be without merit. The judgment of the district court is, therefore, affirmed.

C.A.2 (N.Y.),1997.
Martin v. Chemical Bank
129 F.3d 114, 1997 WL 701359 (C.A.2 (N.Y.))

Briefs and Other Related Documents (Back to top)

• 1997 WL 33774566 (Appellate Brief) Reply Brief for the Appellant (Jun. 03, 1997) Original Image of this Document (PDF)
• 1997 WL 33774565 (Appellate Brief) Brief of Defendants-Appellees (May. 19, 1997) Original Image of this Document (PDF)
• 1997 WL 33774564 (Appellate Brief) Brief for the Appellant (Apr. 28, 1997) Original Image of this Document with Appendix (PDF)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



Slip Copy                                                                                                                    Page 1

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

Briefs and Other Related Documents

United States District Court,E.D. Pennsylvania.
Brian WEBB
v.
INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, Local Union No. 654 and the Chester Joint Apprenticeship and Training Committee
No. Civ.A. 04-3613.

Sept. 23, 2005.

Richard B. Bateman, Jr., Media, PA, for Brian Webb.
Claiborne S. Newlin, Meranze & Katz PC, Steven K. Ludwig, Fox Rothschild O'Brien & Frankel, LLP, Philadelphia, PA, for International Brotherhood of Electrical Workers, Local Union No. 654, and The Chester Joint Apprenticeship and Training Committee.

MEMORANDUM

BAYLSON, J.

I. *Introduction*

*1 Plaintiff Brian Webb brings this action for gender discrimination, sexual harassment, and retaliation against Defendants International Brotherhood of Electrical Workers, Local Union No. 654 ("Local 654") and the Chester Joint Apprenticeship and Training Committee ("CJATC"), pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Webb demands a jury trial and seeks back pay, front pay, punitive, liquidated, and compensatory damages, attorney's fees, costs, and expenses, and reinstatement to a position similar to that from which he was terminated. Presently before the Court are the Defendants' motions for summary judgment.

II. *Background*

The following summary of the alleged facts is drawn from Plaintiff's Oppositions to the Motions for Summary Judgment. Local 654 is the local branch of the national union, International Brotherhood of Electrical Workers. The CJATC is an independent organization formed jointly by Local 654 and the National Electrical Contractors Association, Inc. ("NECA") to train qualified labor for the electrical construction industry. Local 654 and NECA each name three trustees to the CJATC's governing board that administers the apprenticeship program.

During the period relevant to this action, Webb was a member of Local 654 and a trainee in the CJATC's five-year apprenticeship program. Apprentices in the program are assigned to electrical contractors by Local 654 and are rotated periodically to ensure they receive on-the-job training in various types of construction. Webb asserts, and Defendants do not dispute, that Webb was only to work for NECA member electrical contractors if he was a trainee in the CJATC apprentice program.

According to Webb, the alleged sexual harassment began in August 1999 when Webb pierced both of his ears. He has placed in the record substantial facts showing that other members of Local 654 made obscene and abusive comments to Webb, asserting that he was a homosexual. Webb complained to the Local 654 business manager about the harassment.

In November, 1999, Webb alleges that he complained to Local 654 Business Manager James Conroy about the harassment. Webb allegedly told Conroy that his supervisor, Blair, had said that Webb had big lips and called him a "homo" and said that "only faggots get their ears pierced." Conroy allegedly told Webb that he would have to put up with it, and that he should take his complaint

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                          Page 2

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

either to his foreman or to the CJATC. Webb then allegedly expressed his desire to quit the job with Blair, and Conroy told Webb that an apprentice cannot quit a job but that Webb could tell the CJATC he was having problems and possibly be reassigned, but Conroy did not tell Webb that he had a right to make a grievance against Blair.

Webb alleges that he also complained about Blair's conduct to Wayne Connor, who was the CJATC training director and a member of Local 654, and that Connor told Webb that he would take care of Blair's bad report at a December 7, 1999, CJATC meeting that Webb was asked to attend.

*2 Webb then alleges that in February, 2001, he was transferred to work at a new job site at Liberty Power & Light ("Liberty"). Beginning in March or April of 2001, Webb alleges that talk began in the work site that Webb went a club known to be frequented by homosexuals. Co-workers allegedly stated that they had seen Webb at a club called "Shampoo," and Webb's foreman at Liberty, James Donato, claimed that Webb had told Donato that Webb was an exotic dancer. Webb alleges that he never told anyone that he was an exotic dancer, and that Donato wrongly believed Webb to be homosexual.

Webb alleges that both his supervisors and co-workers at Liberty laughed at him and continually called him a "homo," and made sexually offensive drawings and comments at the work site, which Webb found to be humiliating and offensive.

Webb alleges that he continually complained to the general foreman at Liberty, Nick Giambri, about the drawings, of which over a hundred photocopies were made, and about the writings on the walls, and about the drawing of a penis on his hard hat. Webb alleges that Giambri told Webb to quit the job. Webb alleges that Giambri then fired him "because life isn't fair," but that Giambri himself recalls firing Webb because Donato asked him to do so and that other foremen had mentioned to Giambri that Donato was too hard on Webb.

After he was fired from Liberty, Webb attended the CJATC board meeting on September 11, 2001.

Webb alleges that, before the meeting, Local 654 union representative Jeff Scott told Webb to keep his mouth shut. At the meeting, Webb was asked if he was angry, and when he responded that he was, the board ordered Webb to undergo an anger management program, and he was not allowed to return to work until he had done so. According to Webb, the only basis for the board's decision to require him to attend an anger management program were four or five reports which had summarily concluded that Webb had an anger problem, but that did not include descriptions of conduct by Webb that could be considered threatening or abusive. Webb alleges that this was the first time the CJATC had ever required an apprentice to attend an anger management program.

Webb was next assigned to a job at Applied Card Service ("ACS"). Webb alleges that upon arrival at ACS, co-workers immediately began to make comments to Webb similar to those at the previous job sites. Webb alleges that he complained about these remarks to his new supervisor, Giovanni D'Amato, and to his foreman, Jeff Pinca. Webb alleges that talk again began at ACS about Webb going to clubs frequented by homosexuals. Webb alleges that offensive drawings and writings were also made on the wall at ACS.

Webb alleges that he complained about the drawings and writings on the walls at ACS to D'Amato, and that D'Amato has admitted that these drawings were offensive and that Webb was the subject of "gay stuff jokes or ridicule." Webb alleges that the only solution D'Amato offered, however, was to tell Webb not to "let these things get to you, don't let things bother you," and that D'Amato did not tell Webb's co-workers to end the ridicule.

*3 On March 21, 2002, Webb was fired from ACS, after a verbal altercation between Hudlow and Webb. Those present, according to Webb, do not recall any physical contact between the men and one remembers that Hudlow charged at Webb, who was standing still. Following the firing from ACS, Webb attended the April 2, 2002, meeting of the CJATC board. Webb arrived with an attorney, Shelly Farber, Esq., and with photographs of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                   Page 3

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

drawings from the walls at ACS. Webb alleges that the board would not allow Webb's attorney to attend the meeting and refused to consider his sexual harassment complaint, instead deciding to terminate him from the apprenticeship program. Webb alleges that he was told that his sexual harassment complaint was too late, although the board heard Webb's complaints and viewed the photographs of the walls at ACS. Webb alleges that Metzger, the chairman of the board, later stated that he thought Webb's complaints at the meeting were just "sour grapes" and too late to consider, although Metzger was aware that Webb had complained about sexual harassment at his prior position at Liberty.

After his termination, Webb alleges that he called Metzger on April 5, 2002, to find out why he had been terminated, and that Metzger told him that he was terminated for "legal reasons" and because he brought a lawyer and pictures to the meeting.

On April 11, 2002, Webb had an initial interview at the EEOC, and on June 5, 2002, Webb's initial EEOC Charge of Discrimination was sent to Local 654. This initial charge did not name the CJATC as a respondent but mentioned the CJATC's role in Webb's termination. An Amended Charge was later filed, on April 23, 2003, naming the CJATC as a respondent.

At a meeting of the CJATC on July 2, 2002, Webb alleges that the recorded minutes indicate the that the CJATC "received, read and filed a letter" regarding the discrimination charges in Webb's EEOC complaint. On November 19, 2002, Webb alleges that Mr. Webb's truck was vandalized by scratches spelling out "snitch."

At a meeting of the CJATC on December 3, 2002, Webb appeared to request that he be reinstated into the program, but the board's termination decision was not reversed. Local 654 also refused to give Webb a classification, although he is still a union member.

Webb subsequently filed the complaint in this action on July 30, 2004. On April 26, 2005, Defendants filed their motions for summary judgment, and Webb filed briefs in opposition on May 27, 2005. Defendants filed reply briefs on June 9, 2005. On June 16, 2005, Webb moved to strike Defendants' reply briefs. The motion to strike the reply briefs was denied on June 16, 2005.

III. *Summary of Parties' Contentions*

A. *Local 654's Motion for Summary Judgment*

Local 654 argues that Webb's employers, and not the union, are liable for any sexual harassment or discrimination experienced by Webb on the job, unless the union instigated or actively supported the discriminatory acts. (Local 654's Memo. of Law, p. 6, citing *Anjelino v. New York Times Co.*, 200 F.3d 73, 96 (3d Cir.1999)). Local 654 also argues that the harassment complained of by Webb is not harassment on account of sex, but instead harassment on the basis of perceived sexual preference, and therefore does not fulfill the requirements for a showing of same-sex sexual harassment. (Local 654's Memo. of Law, pp. 14-17, citing *Bibby v. Philadelphia Coca Cola Bottling Company*, 260 F.3d 257 (3d Cir.2001)). Local 654 also asserts that Webb's failure to exhaust the union's internal grievance procedures bars his sexual harassment claim. (*Id.* at 10).

*4 As to the discrimination claim, Local 654 argues that Webb cannot show that the union treated other employees' complaints of harassment differently than his. Also, according to Local 654, it was the CJATC, not the union, that compelled Webb to take anger management classes and terminated him from the apprenticeship, and Webb has not demonstrated an agency relationship between the CJATC and Local 654, which are distinct entities. (*Id.* at 12-13). Similarly, Local 654 argues that Webb's retaliation claim against the union fails because the CJATC, not the union, terminated him from the apprenticeship. (*Id.* at 14).

Webb's response to Local 654's Motion for Summary Judgment focuses on the retaliation claim and asserts that although Webb's complaint referred to Local 654 as an employer, Webb in fact bases Local 654's liability for retaliation under Title VII

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                    Page 4

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

on the provisions for "Training Programs" and labor organizations. 42 U.S.C. § 2000e-2(d), 3(a). (Plaintiff's Brief in Opposition, p. 22). Webb also argues that Local 654, like an employer, had an affirmative duty to take appropriate remedial action to address Webb's complaint of sexual harassment and that the union's "constructive endorsement of the sexual harassers through its blatant inaction" forms the basis of his sexual harassment claim. (*Id.* at 23-25).

Webb also argues that Local 654 cannot escape liability for retaliation on the grounds of being a separate entity from the CJATC, because three of the six board representatives of the CJATC are union representatives and thus the CJATC cannot act without the approval of Local 654, and Local 654 thus had an opportunity to prevent the retaliation. (*Id.* at 19-20). Webb also argues that, whether or not Webb had a lawful sexual harassment complaint, all that is required for a retaliation claim is that he had a good faith belief that his complaint was lawful. (*Id.*, p. 20).

In its reply brief, Local 654 argues that a union has no obligation to investigate sexual harassment complaints as long as it does not discriminate in its treatment of other similar complaints, and that regardless, Webb only once complained to an official or agent of Local 654, on a date which Local 654 asserts was before the time period actionable under Title VII (Local 654's Reply, p. 7). According to Local 654, when Webb later complained to other members of Local 654, he complained to them when they were acting as agents of other entities. (*Id.*). Local 654 also argues that Webb's "opportunity to prevent" theory has been rejected by the Supreme Court in *General Building Contractors Ass'n v. Pennsylvania*, 458 U.S. 375, 378, 102 S.Ct. 3141, 73 L.Ed.2d 835 (1982), and regardless, there is no evidence that the union-appointed trustees of the CJATC acted as representatives of Local 654 when they decided whether or not to vote for Webb's termination. (*Id.*, p. 10).

B. *The CJATC's Motion for Summary Judgment*

The CJATC argues that it is entitled to judgment in its favor because Webb failed to timely file a Charge of Discrimination with the EEOC against the CJATC. Webb's initial Charge of Discrimination named only Local 654 as a respondent and the Charge was not amended to include the CJATC until April 23, 2003, more than a year after Webb's termination from the apprenticeship program in early April 2002. The CJATC also argues that Webb was not discriminated against on account of his sex, or that any harassment he suffered was pervasive or regular so as to constitute actionable sexual harassment. The CJATC also contends that Webb has not established the respondeat superior liability required for a discrimination or harassment claim, as the alleged harassers were not members of the CJATC, and that Webb has not established a causal link between any protected activity and his termination from the apprenticeship program, as required for a retaliation claim.

*5 Webb's response again focuses on the retaliation claim, and argues that the alleged admission of Metzger, the CJATC Board Chairman, that Webb had been terminated from the apprenticeship program because he "brought a lawyer and stuff" to the meeting demonstrates that the CJATC retaliated against Webb for pursuing a complaint of sexual harassment, because Metzger was aware that Webb brought the lawyer to the meeting in order to present a sexual harassment complaint. Webb contends that, whether or not the conduct of which he complained was indeed unlawful under Title VII, the retaliation claim may survive as long as his complaint of sexual harassment was made with a good faith, reasonable belief that the conduct of which he complained was unlawful. (Pl's Opposition to CJATC's Motion, p. 20, citing *Barber v. CSX Distribution Services*, 68 F.3d 694, 701-02 (3d Cir.1995)).

Webb also argues that the alleged conduct was indeed sufficiently regular and pervasive to constitute sexual harassment under Title VII, and that the CJATC had an affirmative duty to investigate Webb's complaint of sexual harassment.

As to the timeliness of his EEOC Charge of

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                     Page 5
Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

Discrimination against the CJATC, Webb argues that, although his initial EEOC Charge of Discrimination, filed on April 11, 2002, does not name the CJATC as a party, it described the CJATC's involvement in his termination, and therefore the Amended Charge, filed on April 23, 2003, which names the CJATC as a party, must be backdated to the original filing date of April 11, 2002, because federal regulations allow such an amendment as long as there is no showing of prejudice to a charged party. (Pl's Opposition to CJATC's Motion, p. 27, citing *Peterson v. City of Wichita*, 888 F.2d 1307, 1308-9 (10th Cir.1989)). Here, Webb argues, notes from a July 2, 2002, CJATC board meeting indicate that the CJATC had "received, read and filed a letter" regarding the charges of discrimination in Webb's EEOC complaint, and this evidence of the CJATC's awareness of the EEOC Charge against Local 654 demonstrates that the CJATC was not prejudiced by Webb's delay in amending the Charge to name the CJATC as a respondent. (*Id.*)

In its reply brief, the CJATC reiterates the arguments presented in its Motion for Summary Judgment and argues that the alleged causal link between a protected activity and Webb's termination from the apprenticeship program-Metzger's comment that Webb was terminated because he brought a lawyer and pictures to the meeting-does not constitute evidence that the board's decision was linked to Webb's complaint of sexual harassment.

IV. *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law.

*Id.* "There is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 249.

V. *Discussion*

A. *Local 654's Liability under Title VII*

*6 *Anjelino v. The New York Times Co.*, 200 F.3d 73, 95-96 (3d Cir.1999) upheld the district court's dismissal of Title VII claims against a union " because the Union was not the employer of the appellants; this is so even though some of the supervisors and workers who are alleged to have discriminated against the appellants may have been members of the Union." The Third Circuit stated that a union may be held liable under Title VII when the record demonstrates "that the Union *itself* instigated or actively supported the discriminatory acts allegedly experienced by the appellants." *Id.* at 96. Here, while Webb has alleged that *members* of Local 654 engaged in the allegedly discriminatory acts while working for his employers, he has not shown the existence of facts demonstrating that Local 654 *itself* instigated or actively supported the discriminatory acts. Instead, he argues only that the Local's inaction constructively endorsed the alleged harassment, which is not sufficient to make out a claim for sexual harassment against the union under Title VII.

As to the discrimination claim, while a union may be liable under Title VII for discrimination in its representation of members, Webb makes no allegations that Local 654 treated complaints from members of groups unprotected by Title VII differently from his complaints. *McDonald v. Santa Fe Trail Transp. Co.*, 427 U.S. 273, 284-5, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976).

Perhaps in tacit acknowledgment of the deficiencies in the sexual harassment and discrimination claims against Local 654, Webb's response brief to Local 654's motion focuses on the retaliation claim. To make out a prima facie case of retaliation, Webb " must show that: (1) the employee engaged in a

Slip Copy                                                                                                           Page 6

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 279 (3d Cir.2000). Webb contends that the protected activity in which he engaged were his complaints of sexual harassment on September 11, 2001, and on April 2, 2002, that the adverse employment action taken was his termination from the apprenticeship program on April 2, 2002, and that the causal link between his complaints and the adverse action consists of Mr. Metzger's admission that Webb's termination was due to Webb's appearance with a lawyer and "stuff" at the April 2, 2002, meeting.

The retaliation claim against Local 654, however, must fail, because the CJATC, not Local 654, terminated Webb from the apprenticeship program. Webb argues that because three of the six representatives on the CJATC board are appointed by Local 654, Local 654 should be found liable for the CJATC's actions because Local 654 had an " opportunity to prevent" the retaliation and failed to do so. Under Title VII, however, an entity "may not be held liable for the discriminatory acts of another entity unless the plaintiff can prove the existence of an actual agency relationship, or the existence of an integrated enterprise." *Stair v. Lehigh Valley Carpenters Local Union No. 600,* 1993 WL 235491 *22 (E.D.Pa.1993)(quotations omitted), *aff'd,* 43 F.3d 1463 (3d Cir.1994). In the case of apprenticeship programs, such as the CJATC, which are created as separate, independent trust funds under Section 302(c)(6) of the Labor Management Relations Act, 29 U.S.C.A. § 186(c)(6), if there is no evidence presented that the safeguards created by the statute have been violated, "[s]imply because some union officers were also trustees of the [apprenticeship program] does not establish an agency relationship between the two entities." *Id.* Webb's retaliation claim against Local 654 must therefore also fail.

B. *The CJATC's Liability under Title VII*

*7 There is no dispute that Title VII plaintiffs in Pennsylvania must filed their administrative discrimination charge within 300 days of the challenged employment action.
Under Title VII and the ADEA, plaintiffs residing in states having an agency authorized to grant relief for federally prohibited employment discrimination must resort to that state remedy before they will be allowed access to federal judicial relief. *See* 42 U.S.C. § 2000e-5(c) (Title VII); 29 U.S.C. § 633(b) (ADEA); *Oscar Mayer & Co. v. Evans,* 441 U.S. 750, 754-58, 99 S.Ct. 2066, 60 L.Ed.2d 609 (1979). Such states are termed "deferral" states. *See Evans,* 441 U.S. at 758, 99 S.Ct. 2066, 60 L.Ed.2d 609. It is undisputed that Pennsylvania is a deferral state. *See* 43 Pa. Cons Stat. §§ 955(a), 959; *Sharpe v. Philadelphia Hous. Auth.,* 693 F.2d 24, 26 (3d Cir.1982).
Title VII and ADEA plaintiffs ... who file in deferral states, must submit their administrative discrimination charge within 300 days of the challenged employment action. *See* 42 U.S.C. § 2000e-5(e)(1) (Title VII); 29 U.S.C. § 626(d)(2) (ADEA); *Colgan v. Fisher Scientific Co.,* 935 F.2d 1407, 1413-15 (3d Cir.1991) (en banc).

*Watson v. Eastman Kodak Co.,* 235 F.3d 851, 854 (3d Cir.2000).

It is undisputed that Webb was terminated from the CJATC's apprenticeship program as of April 4, 2002. Webb further alleges that on April 5, 2002, he called Metzger's office to find out why he had been terminated and it was in this conversation that Webb alleges that Metzger stated that Webb had been terminated because he brought a lawyer and pictures to the meeting. As of April 5, 2002, at the latest, therefore, Webb claims against the CJATC accrued.
Under Pennsylvania law, the accrual of a discrimination claim is governed by the discovery rule. A claim accrues upon "awareness of actual injury, not upon awareness that this injury constituted a legal wrong." *Oshiver v. Levin, Fishbein, Sedran & Berman,* 38 F.3d 1380, 1386 (3d Cir.1994); *Bickings v. Bethlehem Lukens Plate,* 82 F.Supp.2d 402, 409 (E.D.Pa.2000). The awareness of an injury, for accrual purposes, occurs when a plaintiff knew or should have known of the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                   Page 7

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
(Cite as: Slip Copy)

injury and that the injury had been caused by another party's conduct. *See Bickings,* 82 F.Supp.2d at 409.

*Lipson v. Jackson National Life Ins. Co.,* 2004 WL 163681 *3 (E.D.Pa.2004).

On April 11, 2002, Webb had his initial interview at the EEOC, and on June 5, 2002, Webb's initial EEOC Charge of Discrimination was sent to Local 654. This initial charge named only Local 654 as a respondent and the charge was not amended to include the CJATC as a respondent until April 23, 2003, more than 300 days after April 5, 2002, the latest date upon which Webb's claims against the CJATC accrued.

To argue for the timeliness of his EEOC Charge, Webb relies on 29 C.F.R. § 1601.12(b), which allows for charges of discrimination to be amended " to cure technical defects or omissions, including failure to verify the charge or to clarify and amplify allegations made therein." The regulation specifies that "[s]uch amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." *Id.* Webb also cites to 29 C.F.R. § 1628.8(c), which similarly provides that a charge "may be amended to clarify or amplify allegations made therein," and that "amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will relate back to the date the charge was first received." Here, however, the addition of the CJATC as a respondent cannot be considered the curing of a technical defect or omission, or as an amplification of allegations, and therefore Webb's amendment of the charge cannot be related back to the date the charge was first received by Local 654. The case relied upon by Webb in support of the application of the relating-back provision when no prejudice is alleged from its application, *Peterson v. City of Wichita,* 888 F.2d 1307 (10th Cir.1989), involves the relating-back of an unverified charge that was later verified, not the addition of a new respondent.

*8 The Second Circuit, however, has recognized an "identity of interest" exception to the general rule requiring a defendant to be named in an administrative charge. *Smith v. Local Union 28 Sheet Metal Workers,* 877 F.Supp. 165, 173 (S.D.N.Y.1995), *aff'd,* 100 F.3d 943 (2d Cir.1996), *cert. den'd,* 519 U.S. 832, 117 S.Ct. 101, 136 L.Ed.2d 55 (1996)(citing *Johnson v. Palma,* 931 F.2d 203 (2d Cir.1991)). To determine whether such an "identity of interest" exists between the named and unnamed defendant, the court must consider the following factors:
1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of the named [party] are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests of the unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Johnson v. Palma,* 931 F.2d at 209-10. Here, there is no question that Webb knew of the CJATC's role in his termination at the time he filed his EEOC complaint. And, although the CJATC was apparently aware of Webb's EEOC complaint against Local 654, this does not provide evidence that the interests of the CJATC, an independent organization formed jointly by the union and the employers, were so similar to Local 654's that it was unnecessary to include the CJATC in the EEOC proceedings, and thus it is difficult to assess whether the CJATC was prejudiced by its absence from the EEOC proceedings. Finally, Webb does not allege that the CJATC in some way represented to him that its relationship with him was to be through Local 654. Therefore, the Court cannot find that there was an "identity of interests" between the CJATC and Local 654 such that an exception to the requirement that a defendant be named in an administrative charge can be made. Having failed to file a timely administrative charge, Webb may not maintain a civil action under Title VII against the

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CJATC. *Smith*, 877 F.Supp. at 172-3.

### C. *Same-Sex Sexual Harassment under Title VII*

Although the Court has determined that summary judgment must be granted in favor of Defendants because of the Defendants' legal grounds unrelated to the Plaintiff's contentions about the substance of the offensive remarks, the latter deserve comment. Plaintiff has undisputedly raised facts showing that he was the victim of constant and scathingly abusive and obscene comments from his co-workers at several different job sites, expressing their dislike of Plaintiff because of personal characteristics usually associated with gay men. Defendants assert that these comments do not show same-sex discrimination against Plaintiff because of his gender, and that the case law does not permit a civil rights claim based merely on sexual preferences.

\*9 In *Bibby v. Phila. Coca-Cola Bottling Co.*, 260 F.3d 257, 259 (3d Cir.2001), the Third Circuit affirmed the district court's grant of summary judgment to the defendant because the plaintiff, whom the court found to have been discriminated against because of his sexual orientation, had not presented sufficient evidence that he suffered discrimination "because of sex" as required by Title VII. While the Supreme Court has held that Title VII does provide a cause of action for same-sex sexual harassment, *Oncale v. Sundown Offshore Services, Inc.*, 523 U.S. 75, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), "Title VII does not prohibit discrimination based on sexual orientation." *Biddy*, 260 F.3d at 261 (citing First, Second, and Eighth Circuit cases in agreement). Webb must therefore " seek relief under Title VII only for discrimination because of sex." *Id.*

In *Biddy*, the Third Circuit summarized the Supreme Court's discussion in *Oncale* of the situations in which same-sex harassment could be seen as discrimination because of sex.
The first is where there is a evidence that the harasser sexually desires the victim.... Same-sex harassment might also be found where there is no sexual attraction but where the harasser displays hostility to the presence of a particular sex in the workplace.... Further, although it is less clear, a plaintiff may be able to prove that same-sex harassment was discrimination because of sex by presenting evidence that the harasser's conduct was motivated by a belief that the victim did not conform to the stereotypes of his or her gender.

*Biddy*, 260 F.3d at 262-63 (citations omitted). Here, Webb has presented no evidence that any of his alleged harassers sexually desired him. There is also no evidence that the alleged harassers displayed hostility to the presence of men in the workplace. Webb thus relies on the theory that he was harassed because the alleged harassers believed that he did not conform to the stereotypes of the male gender.

The evidence Webb points to as demonstrating gender stereotyping are the alleged ridicule of his big lips, of his presence at nightclubs frequented by homosexual patrons, and of his pierced ears, and Hudlow's admission that he called Webb a "cunt," which Webb asserts implies that Webb is a woman. (Pl's Opposition to CJATC's Motion, p. 20-21). Webb compares these to the examples of gender stereotyping in the Supreme Court's decision in *Price Waterhouse v. Hopkins*, 490 U.S. 228, 235, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), the case which forms the basis of the gender stereotyping theory in same-sex harassment cases, in which the plaintiff was told that she should "walk more femininely, talk more femininely, dress more femininely, wear make-up, have her hair styled, and wear jewelry."

Webb also cites to *Kay v. Independence Blue Cross*, 203 WL 21197289 \*5 (E.D. Pa 2003), in which the district court found that, unlike the plaintiff in *Biddy*, Kay was "able to cite ample evidence to support the stereotyping aspect of his claim." Examples of such evidence included Kay being told he was not a "real man" because he wore an earring, as well as mockery of Kay's failure to undertake an activity-changing the water cooler bottle-that " involves some physical strength, i.e., the mocking was aimed at Mr. Kay's masculinity, or perceived lack thereof." *Id.* The district court therefore found that gender stereotyping had occurred, but ultimately concluded that a jury could not reasonably find that the harassment was sufficiently

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

pervasive or regular to create a hostile work environment. *Id.* at *8.

*10 Since the filing of the briefs on these motions, the Third Circuit has affirmed the district court's dismissal in *Kay,* but the circuit court disagreed with the district court's finding of gender stereotyping. *Kay v. Independence Blue Cross,* 2005 WL 1678816 *2 (3d Cir. July 19, 2005)(not precedential). The Third Circuit stated that " [a]ssuming *arguendo* that gender stereotyping can constitute sex discrimination under Title VII, we must still consider 'any stereotypical statements within the context of all the evidence of harassment, and then determine whether the evidence as a whole creates a reasonable inference that the plaintiff was discriminated against because of his sex.' " *Id.* (quoting *Spearman v. Ford Motor Co.,* 231 F.3d 1080, 1085 (7th Cir.2000)). The Third Circuit concluded that the two incidents found to constitute gender stereotyping by the district court, when viewed in the broader context of the harassment alleged by Kay, "clearly demonstrates that the harassment was based on perceived sexual orientation, rather than gender." *Id.*

Here, although some of the harassment alleged by Webb involves ridicule of his appearance-his lips and his pierced ears-that could perhaps in some situations be motivated by gender stereotyping, the broader context of the harassment, including the more offensively obscene remarks and drawings, alleged by Webb, makes it clear that this conduct implicated sexual orientation bias. Webb's own rendition of the facts includes his belief that at least two of his alleged harassers wrongly believed him to be homosexual. Moreover, the overwhelming majority of the harassment alleged focuses on references to Webb's supposed homosexuality or engagement in homosexual acts. The ridicule of his lips and pierced ears focuses on the association of those attributes with homosexuality and homosexual acts. As in *Kay,* no reasonable jury could find that the harassment alleged by Webb, reprehensible though it was, was motivated by gender stereotyping rather than by sexual orientation bias. *Id.* at *2.

The Third Circuit has stated that "[w]hatever the sexual orientation of a plaintiff bringing a same-sex sexual harassment claim, that plaintiff is required to demonstrate that the harassment was directed at him or her because of his or her sex." *Biddy,* 260 F.3d at 265. If such a showing is made, "it is no defense that the harassment may have also been partially motivated by anti-gay or anti-lesbian animus." *Id.* Here, however, Webb has failed to demonstrate that the alleged harassment was directed at him because of his sex.

As Judge Rendell points out in her concurring opinion in *Kay,* however, "[t]he line between discrimination based upon gender stereotyping and that based upon sexual orientation is difficult to draw." *Kay,* 2005 WL 1678816 *3. In this case, however, the Court need not rely solely on the finding that the harassment alleged fails to demonstrate gender stereotyping actionable under Title VII, because, as discussed above, alternative grounds exist for granting Defendants' motions.

*11 The Court also notes that Congress has on many occasions considered expanding civil rights anti-discrimination laws to cover discrimination based on sexual orientation, but such legislation has never passed. This Court also declines to extend the current case law to cover such claims as presented by Plaintiff under a sexual orientation theory.

### VI. *Conclusion*

Based on the foregoing, the Court finds that Webb's claims against Local 654 must fail because the union cannot be held liable for the alleged actions of its members or of the CJATC, and that Webb's claims against the CJATC cannot survive because of Webb's failure to file a timely Charge of Discrimination against the CJATC with the EEOC. The Court finds in the alternative that the facts alleged by Webb do not create a triable issue of fact as to whether Webb experienced discrimination or sexual harassment actionable under Title VII. Defendants' motions for summary judgment are therefore granted.

An appropriate Order follows.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Slip Copy                                                                                                                          Page 10

Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215
**(Cite as: Slip Copy)**

ORDER

AND NOW this 23rd day of September, 2005, upon consideration of Defendants' Motions for Summary Judgment (Docket Nos. 11 & 12), and the responses thereto, it is hereby ORDERED that the Motions are GRANTED. Judgment is entered in favor of Defendants and against Plaintiff. The Clerk shall close this case.

E.D.Pa.,2005.
Webb v. International Broth. of Elec. Workers
Slip Copy, 2005 WL 2373869 (E.D.Pa.), 96 Fair Empl.Prac.Cas. (BNA) 1215

Briefs and Other Related Documents (Back to top)

• 2:04cv03613 (Docket) (Jul. 30, 2004)
• 2004 WL 1898798 (Trial Pleading) Complaint (2004)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.